**SOUTHERN CALIFORNIA EDISON CO.** ("EDISON"); and Department of Water and Power of the City of Los Angeles, Public Service Department of the City of Burbank, Public Service Department of the City of Glendale, and Water and Power Department of the City of Pasadena (Collectively "LADWP, et al."), Petitioner,

v.

**James JURA, Administrator, Bonneville Power Administration, Federal Energy Regulatory Commission, Respondents,**

**Portland General Electric Company,**
Respondent–Intervenor.
Respondent–Intervenor.

**PUBLIC UTILITIES COMMISSION OF the STATE OF CALIFORNIA,**
Petitioner,

v.

**BONNEVILLE POWER ADMINISTRATION, Federal Energy Regulatory Commission, Respondents.**

**CALIFORNIA ENERGY COMMISSION, Petitioner,**

v.

**BONNEVILLE POWER ADMINISTRATION, Federal Energy Regulatory Commission, Respondents.**

**ASSOCIATION OF PUBLIC AGENCY CUSTOMERS, Petitioner,**

v.

**BONNEVILLE POWER ADMINISTRATION; James Jura, Administrator, Bonneville Power Administration, Federal Energy Regulatory Commission, Respondents.**

Nos. 87–7477, 87–7486, 87–7499 and 87–7511.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 9, 1989.

Decided July 13, 1990.

Jonathan Blees, Sacramento, Cal., for California Energy Com'n.

John D. McGrane, Reid and Priest, Washington, D.C., for Southern California Edison Co.

Peter G. Fairchild, San Francisco, Cal., for California Public Utilities Com'n.

Max M. Miller, Jr., Tonken, Torp, Galen, et al., Portland, Or., for Northwest Parties.

Marybeth VanBuren, Portland, Or., for Bonneville Power Admin.

Joanne Leveque, Washington, D.C., for F.E.R.C.

Before CANBY, THOMPSON and LEAVY, Circuit Judges.

CANBY, Circuit Judge:

A coalition of Northwest utility companies and industrial purchasers of electricity challenges the Bonneville Power Administration's adoption of a schedule of rates for energy sold to customers outside the Northwest region. The Northwest parties claim that the design of the schedule is inconsistent with Bonneville's statutory obligation to attempt to recover costs. Several California utility companies, joined by California's Energy and Public Utility Commissions, also challenge the rate schedule. The California parties claim that the rates inappropriately include costs associated with maintaining certain system reserves, and also unfairly discriminate against non–Northwest purchasers. We reject both challenges, and uphold the rates as set by Bonneville and approved by the Federal Energy Regulatory Commission.

## I

The Bonneville Power Administration ("BPA") is a self-financing power marketing agency within the United States Department of Energy. 16 U.S.C. § 832–832*l*. It generates, collects and distributes electric energy by means of a large network of production and transmission facilities known as the Federal Columbia River Power System. 16 U.S.C. § 839a(10)(A). BPA's primary obligation is to provide electricity to the Pacific Northwest, and it has authority to supply customers outside that region only with power that is surplus to Northwest needs; in addition, it must show a preference for public over private purchasers. 16 U.S.C. § 837a; 16 U.S.C. § 832c(a). BPA periodically revises the rates at which it sells energy to ensure that

it "recover[s], in accordance with sound business principles, the costs associated with the acquisition, conservation, and transmission of electric power ... and other costs and expenses incurred by [BPA]." 16 U.S.C. § 839e(a)(1).

In January of 1983, BPA issued public notice that it would review its existing rates; two months later, it proposed new rates. Between March and September, BPA arranged and conducted extensive evidentiary hearings, as required by statute. *See* 16 U.S.C. § 839e(i). In October, it formally filed "NF–83", the schedule of rates for nonfirm [1] electric power that is at issue in this case. NF–83 contained three distinct rates: Standard (18.5 mills/kWh), Spill (11 mills/kWh), and Displacement (7 mills/kWh or 3 mills/kWh).[2]

BPA proposed to offer these rates sequentially, as market conditions changed. The marketing period would begin with the cost-based Standard rate in effect; if and when the supply of unsold energy became so great that hydroelectric plants were "spilling" water rather than running it through their turbines, then BPA would offer the below-cost Spill rate; if and when the market for energy at the Spill rate became saturated, then BPA would offer remaining energy supplies at the further below-cost Displacement rate. To comply with its statutory preference obligations, BPA resolved to offer each rate, beginning with Standard, to potential customers in the following order: Northwest public purchasers, Northwest private purchasers, non-Northwest public purchasers, non-Northwest private purchasers. Thus, BPA nonfirm energy would be available to all customers at one rate before it became available to any customer at a lower rate.

The Federal Energy Regulatory Commission ("FERC") granted interim approval of NF–83 on October 26, 1983, and the schedule went into effect in November 1983. *See United States Dep't of Energy— Bonneville Power Admin.*, 25 F.E.R.C. ¶ 61,140 (1983).[3] During the NF–83 period, BPA offered and sold power to Northwest and California customers at both Standard and Spill rates. Whenever supplies remained unsold at those rates, BPA also offered power at the Displacement rate. Northwest customers, the first to be offered this rate, always purchased the entire supply, however. As a result, BPA never was able to offer Displacement rate power to California customers. *United States Dep't of Energy—Bonneville Power Admin.*, 36 F.E.R.C. ¶ 63,061 at 65,156 (1987).

In the spring of 1984, FERC initiated its procedure for final approval of NF–83. *See United States Dep't of Energy— Bonneville Power Admin.*, 27 F.E.R.C. ¶ 61,251 (1984). Eighteen parties, including all of those involved in this case, participated in the FERC hearing. Relying upon another administrative decision on an earlier set of rates, Administrative Law Judge Leventhal accepted the Northwest Parties' contention that NF–83 violated BPA's statutory mandate to recover all of its production costs. 36 F.E.R.C. ¶ 63,061 at 65,165. Judge Leventhal also agreed with the California Parties that NF–83's Standard rate

---

1. "Nonfirm" is an accounting term. Devising a worst-case scenario from historical data on streamflows, BPA calculates the minimum amount of energy it is likely to produce during a given period in the future, and designates this amount as its "firm power" for that period; it refers to all energy in excess of that amount as "nonfirm power".

2. To receive energy at the Displacement rate, purchasers would have to demonstrate that they would use BPA energy *instead of* energy from other sources. The actual price to be paid would depend upon the source of the energy to be replaced, 7 mills/kWh if the replaced source

were coal-fired and 3 mills/kWh if the replaced source were nuclear.

There were also two additional rates in NF–83, Incremental (2 mills/kWh above incremental cost), and Contract (13.9 mills/kWh). In fact, however, BPA never reached the point of offering the Incremental rate and applied the Contract rate in only a few isolated instances. Neither of these rates is at issue in this case.

3. NF–83 remained in effect until July 1985, when it was replaced by another schedule. *United States Dep't of Energy—Bonneville Power Admin.*, 39 F.E.R.C. ¶ 61,069 (1987).

improperly included costs associated with industrial reserves; however, he ruled that because these costs did not greatly affect the rate, their inclusion was not a sufficient ground for invalidation. *See id.* at 65,163. Finally, Judge Leventhal found that NF–83 was not "unduly discriminatory", and that, in any event, "no specific law ... limit[ed] BPA to selling nonfirm energy on a nondiscriminatory basis." *See id.* at 65,157 and 65,154 (1986).[4] On exceptions by the parties, the entire Commission reviewed Judge Leventhal's decision, reversing on the first issue, and affirming on the second and third; consequently, NF–83 received final approval. *See United States Dep't of Energy—Bonneville Power Admin.*, 39 F.E.R.C. ¶ 61,069 at 61,192.

## II

Our authority to hear these cases derives from a specific grant of jurisdiction to review final rate determinations by BPA. *See* 16 U.S.C. §§ 839f(e)(1)(G), (e)(4)(D), (e)(5). That grant circumscribes the scope of our review. Accordingly, we must decide whether "substantial evidence in the rulemaking record" supports the NF–83 rates. 16 U.S.C. § 839f(e)(2); *see also, Aluminum Co. of America v. Bonneville Power Admin.*, 891 F.2d 748, 752 (9th Cir. 1989) (*"Alcoa"*). In addition, we may not approve NF–83 if we determine that it represents BPA action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706 (made applicable to BPA action by 16 U.S.C. § 839f(e)(2)); *see also Alcoa*, 891 F.2d at 752. Applying these standards, we uphold the NF–83 rate schedule against the objections of the California and Northwest parties.

## A. *Rate Design and Cost Recovery*

■ Contrary to the position of the Northwest Parties, BPA did not act unlawfully by designing NF–83 so that its high-

est rate was equal to cost and its other rates were below cost. The two rate schedules that preceded NF–83, NF–1 and NF–2, also shared this feature. In reviewing FERC's approval of them, we considered the same argument that the Northwest Parties make here, namely that BPA's statutory mandate to recover its costs prohibits it from adopting any below-cost rate that is not offset by an above-cost rate. *Alcoa*, 891 F.2d 748 at 760–61. We concluded in *Alcoa* that a nonfirm energy rate design containing "cap rates at the full cost of production as well as below-cost rates.... comports with all the statutory requirements." *Id.* at 761. That conclusion applies equally to NF–83.

## B. *Industrial Reserve Costs*

■ Through contractual arrangements, BPA agrees to provide power directly to a number of large industrial users of electricity ("Direct Service Industries" or "DSIs"). These contracts permit BPA to interrupt this service when necessary to protect its ability to meet its primary or "firm" energy demands. In exchange, the industrial customers receive a credit for providing what is in effect a reserve supply of energy. BPA treated DSI credits as part of the cost of nonfirm power, and included them in calculating the cost-based Standard rate. This inclusion was proper.

Section 7(g) of the Northwest Power Act provides that BPA "shall equitably allocate" the cost of reserves to "power rates." 16 U.S.C. § 839e(g). Both BPA and FERC interpret the provision to mean that the credits to direct service industrial customers are in principle allocable to nonfirm energy rates. *See* 39 F.E.R.C. ¶ 61,069 at 61,184–85.[5] Both also implicitly interpret the standard of equitable allocation to mean that BPA should allocate the credits to nonfirm rates only if the reserves produced by DSI credits benefit nonfirm energy customers by making nonfirm energy

---

4. The parties raised other points before the Administrative Law Judge, but only these three are at issue here.

5. BPA and FERC disagree on whether the allocation is mandatory. BPA adopts the view that it *must* allocate the credits to both firm and nonfirm rates; FERC interprets the provision to

more available. *See id.* at 61,183, 61,185–86. These are reasonable interpretations of the statutory language, and therefore we defer to them. *See Alcoa,* 891 F.2d at 752.

BPA and FERC disagree, however, about whether nonfirm customers did in fact receive a benefit from the existence of the reserves. We conclude, with BPA, that they did. In arguing for the adoption of NF–83, the BPA Administrator explained the link between the reserves and nonfirm energy:

> These reserves support BPA's ability to generate Federal system power and, therefore, contribute to the availability of nonfirm energy. While it is true that BPA does not restrict the DSI's in order to make nonfirm sales, the existence of the reserves allows more nonfirm sales to be made without jeopardizing firm loads.

Administrator's Record of Decision, Bonneville Power Administration 1983 Final Rate Proposal (September 1983) at 297. This explanation provided substantial support for the inclusion of DSI credits in the cost-based Standard rate.

### C. *Discrimination*

 During the NF–83 period, there were occasions when Northwest customers were able to purchase BPA power for as little as 7.0 mills/kWh (the Displacement rate) while non-Northwest customers were unable to purchase BPA power for less than 11.0 mills/kWh (the Spill rate) or 18.5 mills/kWh (the Standard rate). This disparity in the lowest prices paid by Northwest and non-Northwest customers, however, did not constitute a violation of BPA's ratemaking standards.

Section 7(k) of the Northwest Power Planning Act, now codified at 16 U.S.C. § 839e(k), governs the establishment and approval of BPA's rates for nonfirm power sold to customers outside the Northwest. In that provision, Congress directed that BPA set these rates in accordance with the Bonneville Project Act, the Flood Control Act of 1944 and the Federal Columbia River Transmission System Act. *See* 16 U.S.C. § 839e(k). These three laws supply four distinct requirements: BPA must (1) have regard for recovering the costs of generating and transmitting energy; (2) encourage the most widespread use of its power; (3) provide the lowest possible rates consistent with sound business principles; and (4) protect the interest of the United States in amortizing its BPA investment within a reasonable period of time. *See* 16 U.S.C. §§ 832–832*l*, 825s, 838–838k; *see also Alcoa,* 891 F.2d at 753.[6]

Conceding that § 7(k) imposes no express prohibition on discrimination against non-Northwest purchasers, the California Parties suggest that a Congressional intent in favor of such a prohibition is implicit in the underlying purpose of that section. BPA and FERC counter that the absence of an explicit nondiscrimination standard should be decisive; Congress has shown that when it intends such a standard to apply to administrative action, it evinces that intention in clear and direct language in the relevant statute itself.

We accept the latter interpretation of § 7(k), since BPA and FERC are the agencies charged with administering the provision, and their reading is a reasonable one that is neither inconsistent with statutory mandate nor likely to frustrate legislative policy. *See Alcoa,* 981 F.2d at 752. Congress has expressly prohibited discrimination or "undue" discrimination in other very similar administrative contexts. *See,*

---

mean that BPA *may* allocate them to nonfirm as well as firm rates. Because we uphold BPA's inclusion of the credits in NF–83, we need not decide whether § 839e(g) would allow BPA to assign these costs to firm rates alone.

**6.** Relying upon a sentence in the Flood Control Act of 1944, the California Parties suggest a fifth requirement, namely, that BPA be "fair and

reasonable" in setting nonfirm rates. We recently noted, however, that in the Flood Control Act that phrase refers to the acquisition and construction of *transmission* facilities, rather than to ratemaking. *See Alcoa,* 891 F.2d at 753–54. For that reason, we declined to consider it a fifth constraint on BPA's nonfirm power rates. *See id.*

*e.g.,* 16 U.S.C. § 824d(b) (forbidding public utilities from granting any person "undue preference or advantage" and from subjecting any person to "undue prejudice or disadvantage"); 16 U.S.C. § 825s–3 (dictating that the Southwestern Power Administration sell electricity "at uniform systemwide rates, without discrimination between customers"); 16 U.S.C. § 838d (ordering that BPA make its transmission facilities available to utilities "on a fair and nondiscriminatory basis"). Yet, it has not done so in § 7(k). We therefore are reluctant to infer that Congress intended the standard to apply to BPA's nonfirm power rates.

The possibility that Northwest purchasers may purchase some of their power at more favorable rates than those available to California purchasers is inherent in the statutory provision that power may not be offered to non-Northwest purchasers unless it is surplus to Northwest needs. 16 U.S.C. § 837a. That BPA need not accommodate all purchasers at equal prices or even within a certain limited range of prices is not inconsistent with the purpose of § 7(k). We acknowledge that Congress enacted this section to provide non-Northwest purchasers with a measure of protection against possible BPA bias toward the Northwest. *See Southern California Edison Co. v. Federal Energy Regulatory Comm'n,* 770 F.2d 779, 786 (9th Cir.1985); *California Energy Comm'n v. Johnson,* 767 F.2d 631, 635 (9th Cir.1985); *Central Lincoln People's Utility Dist. v. Johnson,* 735 F.2d 1101, 1107 (9th Cir.1984). But protection remains even without a substantive nondiscrimination standard for BPA ratemaking. Section 7(k) still ensures that FERC, a nonregional agency not apt to possess a pro-Northwest bias, will review rates set by BPA for compliance with statutory obligations.

In sum, BPA met its ratemaking responsibilities by conforming to the standards explicitly mentioned in § 7(k); it need not have chosen, from the variety of rate schedules consistent with those standards, the one that was least discriminatory toward non-Northwest purchasers.

FERC's approval of NF–83 is hereby AFFIRMED.